**BROADWATER FARMS JOINT VENTURE, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 94–1041 L.

United States Court of Federal Claims.

Oct. 25, 1999.

Keith A. Rosenberg, Washington, D.C., for plaintiff.

---

Thomas L. Halkowski, United States Department of Justice, Washington, D.C., for defendant.

## OPINION AND ORDER

HODGES, Judge.

At trial, we addressed the economic impact of a use prohibition imposed upon plaintiff by the Army Corps of Engineers under Section 404 of the Clean Water Act. We determined that because the alleged taking represented a mere diminution in value of the subject property, it did not constitute a compensable taking. This case was remanded by the United States Court of Appeals for the Federal Circuit to make findings with regard to the two remaining factors in the partial takings analysis: the character of the Government's actions and the reasonableness of plaintiff's investment-backed expectations. A careful review of the record establishes that a partial taking did not occur.

## BACKGROUND

Plaintiff Broadwater Farms Joint Venture is a general partnership that buys and prepares unimproved land for residential developers. It contracts out for roads, electrical lines, storm drains, and sewage removal systems for residential development. Broadwater Farms purchased property known as Spyglass in 1987. Spyglass consists of 51 lots located in the Chesapeake Bay Critical Area of Anne Arundel County, Maryland. It was subdivided, platted, and zoned for residential use by the County in 1978. The property consisted of 24 lots in Phase II and 27 lots in the largely undeveloped Phase III. This case concerns an order by the Army Corps of Engineers to cease development in Phase III.

Broadwater Farms contracted to deliver prepared parcels to a residential developer for Phase III. When work on Phase III was 85% complete, an employee in the Corps' enforcement section surveyed the property and determined that much of the development had been built in violation of the Clean Water Act. Plaintiff received a cease and desist order from the Corps on August 18. Broadwater Farms insisted that it had acted consistently with the permits and plans approved by the County. The Corps responded by allowing construction to continue in some areas, but restricting it in others. In November, Broadwater Farms received a letter from the Corps outlining an agreement whereby plaintiff was ordered to restore 11 lots "to the maximum extent possible." The letter did not indicate that plaintiff could apply for a permit in the future.

County zoning issues were another concern. Anne Arundel County launched a comprehensive county-wide rezoning program that downzoned a significant portion of plaintiff's development from residential to open space.

Plaintiff is a sophisticated investor. It had become familiar with the Clean Water Act and the Army Corps of Engineers on previous development projects. Prior to the purchase of the Spyglass property, plaintiff obtained Corps authorization to develop wetlands in a project known as Severn Woods. In several instances, plaintiff either obtained necessary authorization from the Corps or avoided development of wetlands. Plaintiff was familiar with the potential effects of the Clean Water Act on development before the Broadwater Farms project began.

Maintenance of wetlands through the Clean Water Act is of great public importance. The Corps was willing to compromise on some issues during enforcement of the Act. Its desire to compromise was tempered by its awareness of the long-recognized goal of preserving the nation's wetlands.

## DISCUSSION

■ The Federal Circuit agreed that a categorical taking did not occur. *See Broadwater Farms Joint Venture v. United States*, 121 F.3d 727, 1997 WL 428516 (Fed.Cir. 1997). It remanded the case for consideration of a partial regulatory taking. To make such a determination, we balance three factors: 1) the economic impact of the regulation on the claimant; 2) the extent to which the regulation interferes with investment-backed expectations; and 3) the character of the government action. *See Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978); *Florida*

*Rock Indus. v. United States,* 18 F.3d 1560, 1564 (Fed.Cir.1994). We have examined the economic impact of the regulation; now we address the remaining two factors.

## I. Reasonable Investment–Backed Expectations

■ Where a party has been denied the full use of property by a regulation, this court will limit recovery to "owners who can demonstrate that they bought their property in reliance on the nonexistence of the challenged regulation." *See Creppel v. United States,* 41 F.3d 627, 632 (Fed.Cir.1994). Where a regulatory scheme is in place at the time of purchase, as was the Clean Water Act here, the reasonableness of the buyer's expectations must be discounted. This court has held that "a regulatory structure can thoroughly abrogate a property owner's investment-backed expectation." *See Forest Properties v. United States,* 39 Fed.Cl. 56, 76 (1997).

■ Congress enacted the Clean Water Act in 1972. Plaintiff had both actual and constructive knowledge of the regulatory scheme when it purchased the Spyglass property in 1987. The Act's implications for development of the subject property. Indeed, plaintiff or its representatives had dealt with the Act's mandates on three previous occasions. It had actual knowledge not only of the regulatory scheme in place, but also of the possible existence of non-tidal wetlands on the subject property. Plaintiff's engineer informed his client that the existence of non-tidal wetlands on the property seemed possible and advised that the presence of non-tidal wetlands could affect development.

Even if it had no actual knowledge, plaintiff had constructive knowledge of the regulation. It could not reasonably have expected to be free of government regulation in the development of Spyglass.

Well prior to this period (1988), the public was clearly on notice that the development of wetland areas was subject to compliance with section 404 of the Clean Water Act. As a sophisticated real estate developer,

FPI (plaintiff) would be charged with knowledge of this regulatory scheme. *Id.* at 77.

Plaintiff had actual knowledge of the Clean Water Act. It is not reasonable for a sophisticated developer with actual knowledge of both a regulatory scheme and the possible existence of non-tidal wetlands, to expect unencumbered development of the subject property. Plaintiff did not establish that it had reasonable investment-backed expectations for its planned development.

## II. Character of the Government Action

■ Courts do not always examine the character of the Government action in a partial takings analysis. "The *Lucas* court omitted discussing factor number one (the character of the governmental action) . . . (probably because) this factor generally prompts inquiries as to whether or not the Government's action is analogous to a physical invasion of its property." *Id.* at 75. This case does not involve a physical invasion.

When the court in *Forest Properties* examined the Government's enforcement of the Clean Water Act, it found that "(b)ecause wetlands serve important environmental functions . . . there is no room for doubt that the governmental action in this case served an important purpose via the process for obtaining a section 404 permit." *Id.* at 76. The court found a "legitimate public welfare duty to preserve the nation's wetlands, and it is a worthy national goal." *Id.* at 75.

Plaintiff's argument rests primarily on the notion that while the regulation conferred a benefit on society as a whole, it left the landowner without compensation. Plaintiff argues that the Corps' approach was not one of compromise but was "unreasonable and irresponsible." At times the Corps may have been zealous, but it did work toward a compromise. In fact, the Corps noted an error in the county zoning survey that enabled plaintiff to develop an additional 2.36 acres of the original 8.6 that were downzoned to "open space" by the County. The character of the government action was not improper.

As we noted at trial, the Corps' permitting and enforcement offices were working in step, so that the enforcement action indicated

that plaintiff would not receive a permit for development. To a certain extent, we said that this left plaintiff in an "absurd position." *See Broadwater Farms,* 35 Fed.Cl. at 237. True, plaintiff would not be allowed a permit by regulation upon restoration of the property. *See* 33 C.F.R. § 326.3(e)(1)(i). However, as was previously noted, plaintiff knew of the Clean Water Act and its permitting process before purchasing the land.

Plaintiff took a calculated risk in developing the subject property, when it had no reasonable basis for expecting that it would receive a permit. Plaintiff had actual knowledge that non-tidal wetlands existed on the property after consulting with its engineer. Finally, to the extent the Corps seemed unwilling to compromise, it was merely enforcing a regulation as ordered by Congress. If at times the Corps was overly zealous in its enforcement, this alone does not tip the scales in plaintiff's favor.

## CONCLUSION

Upon consideration of the remaining factors in the partial takings analysis, we find that no compensable taking occurred. Plaintiff was not denied all economic use of the property. The Corps' restoration order resulted in no more than a diminution in value. Plaintiff's investment-backed expectations were not reasonable. Plaintiff is a sophisticated investor who took a calculated risk in choosing to forgo the Clean Water Act permitting process as well as ignoring the warnings that the subject property included wetlands. Plaintiff introduced some evidence that the nature of the Corps' action was unreasonable, but it was not sufficient to make this a compensable taking.

The Clerk will enter judgment for defendant. No costs.